**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Bradley Young,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>Owners Insurance Company, et al.,<br><br>　　　　　Defendants. | No. CV-20-08077-PCT-DWL<br><br>**ORDER** |

  Plaintiff Bradley Young ("Plaintiff") was walking home from a New Year's Eve party when he was struck by an uninsured motorcyclist. The accident, which caused Plaintiff to sustain serious injuries, occurred in an area known as the Imperial Sand Dunes ("the Dunes"). Although the Dunes are not paved or graded, certain areas within the Dunes that are sometimes used for vehicular travel have come to be known as "sand highways."

  Following the accident, Plaintiff unsuccessfully sought uninsured motorist benefits from his insurer, Defendant Owners Insurance Company ("Defendant"). In the letter explaining the denial of benefits, Defendant emphasized that the term "uninsured motor vehicle" was defined in Plaintiff's policy to exclude "any vehicle designed for use mainly off public roads while not on public roads" and stated that Plaintiff was not entitled to coverage pursuant to this definition because the motorcycle that struck him was designed for use mainly off public roads and the accident did not occur on a public road.

  Dissatisfied with this outcome, Plaintiff filed a complaint seeking declaratory relief as to Defendant's coverage obligations. In December 2021, the Court granted summary

judgment in favor of Defendant, concluding that although "[w]hether the informal sand highway located in the Imperial Sand Dunes qualifies as a public road is an interesting and close question, . . . it is unnecessary to resolve that question here in light of Plaintiff's deposition testimony. When asked to identify specifically where he was walking at the time he was struck, Plaintiff admitted that he was next to the fence in a pedestrian area where everybody walks. . . . [T]his testimony is fundamentally inconsistent with the notion that the accident occurred on a public road, because the area next to a road where pedestrians customarily walk is necessarily no longer part of the road. Thus, even assuming the sand highway itself could qualify as a public road, Plaintiff's deposition testimony establishes that he was not on a public road at the time of the accident." (Doc. 72 at 8, cleaned up.) However, after Plaintiff appealed, the Ninth Circuit concluded that coverage would potentially be available even if Plaintiff was standing in the pedestrian area at the time of the accident and thus remanded for the Court to "determine, in the first instance, whether the sand highway is a public road under the insurance policy at issue." *Young v. Owners Ins. Co.*, 2022 WL 17352441, *1 (9th Cir. 2022).

The Court now addresses that question, based on the arguments in the parties' cross-motions for summary judgment. (Docs. 66, 67.) For the following reasons, the Court largely adopts Plaintiff's position regarding how to define the term "public road" but concludes that even under that definition, disputed issues of fact preclude the entry of summary judgment in his favor. Accordingly, both motions are denied.

**BACKGROUND**

I. Factual Background

The following facts, which are uncontroverted, are taken from the parties' summary judgment submissions. Additional facts bearing on the parties' specific summary judgment arguments are addressed in later portions of this order.

At the time of the accident, Plaintiff ran a food truck business called "Daddy's Famous Foods." (Doc. 66-2 at 19.) As part of that business, Plaintiff had "a 5,000-square-foot spot that [he] served food out of" in Glamis, California. (*Id.*) At least

part of Glamis is located within the Dunes, a federal recreation area administered by the Bureau of Land Management ("BLM"). (Doc. 66-2 at 42; Doc. 67-10.) Between October and April, Plaintiff typically stayed in Glamis "on the weekends" in a trailer attached to his food truck. (Doc. 66-2 at 19.)

On December 31, 2018, Plaintiff attended a New Year's Eve party at a friend's house in Glamis. (Doc. 66-2 at 2. *See also* Doc. 67-6 at 4 ["I was at Greg Biffle's compound."].) In the late evening, Plaintiff left the party and started to walk back to his camper trailer. (Doc. 66-2 at 4; Doc. 67-6 at 4.)

At the time of the accident, Plaintiff was walking in the vicinity of a route described by locals and law enforcement as a "sand highway." (Doc. 66-2 at 8, 10, 48; Doc. 67-6 at 7 ["[T]hat's what everybody calls it."]; Doc. 67-9 at 5. *See also* Doc. 67 at 6 [Defendant's summary judgment motion, acknowledging that "[t]his accident occurred in the area of the 'sand highway' that runs from the Vendor's Row or Glamis Flats area out to the washes"].) During his deposition, Plaintiff elaborated: "Sand Highway is right there, and then there is a fence line right there, and I walked along the fence line." (Doc. 67-6 at 7.) Plaintiff also drew markings on a photograph of the area to depict the relevant features—the parallel red and blue lines depict a portion of the sand highway and the nearby red circle depicts the house that Plaintiff had been visiting before leaving to walk home:



(Doc. 67-8 [photo]; Doc. 68-2 [deposition testimony describing markings].)[1]

During his walk, Plaintiff was struck by David Gantz ("Gantz"), who was driving a Yamaha motorcycle. (Doc. 66-2 at 6; Doc. 67-6 at 7-8.) Gantz had not insured the motorcycle. (Doc. 66-2 at 21.)

Plaintiff testified that he did not see Gantz coming and "got hit from behind." (Doc. 67-6 at 8.) When asked to identify "specifically where [he was] walking at the time [he was] struck," Plaintiff testified that he was "[i]n the sand line next to the fence . . . where everybody walks" and agreed with counsel's characterization of this area as "a pedestrian area." (Doc. 67-3 at 9-10.) Plaintiff also denied having any impairment that would interfere with his ability to remember the underlying events. (Doc. 71-1 at 4.) However, when passersby came upon the accident scene, they did not find Plaintiff lying in the pedestrian area. Instead, one witness testified that Plaintiff "was lying in the road . . . approximately 10 to 20 yards off the fence line" and that Gantz's motorcycle was also "on the ground in the middle of the road . . . maybe 10 to 15 yards ahead of where [Plaintiff] was located." (Doc. 66-2 at 13.) Other witnesses provided similar accounts. (*Id.* at 8, 10, 15.)

II.     The Insurance Policy

On November 13, 2018, Defendant renewed a commercial automobile insurance policy (the "Policy") issued to Brianna Young, Plaintiff's daughter, and Daddy's Famous Foods. (*Id.* at 23.) The Policy covered "[t]he Named Insured and any family members." (*Id.* at 25.) It is undisputed that Plaintiff is a family member covered by the Policy.

The Policy included an endorsement entitled "Arizona—Uninsured Motorist Coverage." (Doc. 67-4 at 36-38.) In general, this endorsement obligated Defendant to "pay all sums the insured is legally entitled to recover as compensatory damages from the

---

[1] According to Sergeant Murad Masad, who is employed by the Imperial County Sheriff's Office, there are three different areas in the Dunes that are referred to as "sand highways": the "official sand highway" that parallels Highway 78; the sand highway from the flats to Oldsmobile Hill; and the sand highway from the Glamis Flats to the washes. (Doc. 67-9 at 5, 7-9.) The accident in this case occurred in an area that Sergeant Murad described as "[n]ear Vendor Row, Glamis Flats area." (*Id.* at 14.)

owner or driver of an uninsured motor vehicle." (*Id.* at 36.) However, in the "Additional Definitions" section of the endorsement, the term "uninsured motor vehicle" was defined as "not includ[ing] any vehicle designed for use mainly off public roads while not on public roads." (*Id.* at 38.) The Policy did not define the terms "public roads," "designed for use," or "mainly."

On February 20, 2020, in response to a demand letter from Plaintiff's counsel, Defendant advised that it would "respectfully decline [Plaintiff's] demand for payment" based on the aforementioned policy language. (Doc. 66-2 at 65.) Specifically, Defendant asserted that "[i]t appears that the dirt bike involved in this accident was not an 'uninsured motor vehicle' as that term is defined in the [Policy]. It is a vehicle designed for use mainly off public roads. In fact, it appears the dirt bike was not registered to be driven on public roads. In addition, this accident did not occur on a public road. As a result, the uninsured motorist coverage does not apply." (*Id.* at 66-67.)

III.   Procedural Background

On April 8, 2020, Plaintiff initiated this action by filing a complaint that named Defendant and Progressive Casualty Insurance Company ("Progressive") as defendants. (Doc. 1.)

On April 14, 2020, the Court ordered Plaintiff to file an amended complaint properly alleging the citizenship of each party. (Doc. 6.)

On April 23, 2020, Plaintiff filed the first amended complaint. (Doc. 7.)

On April 27, 2020, the Court ordered Plaintiff to amend the complaint for a second time to properly allege Defendant's and Progressive's places of incorporation. (Doc. 8.)

On April 28, 2020, Plaintiff filed the second amended complaint. (Doc. 9.)

On June 29, 2020, Plaintiff filed the third amended complaint, adding Commerce Insurance Company ("Commerce") as a defendant. (Doc. 18.)

On October 28, 2020, the Court severed Plaintiff's claims against Progressive and Commerce and ordered those claims transferred to the District of Massachusetts. (Doc. 41.) The Court retained jurisdiction over Plaintiff's claim against Defendant. (*Id.*)

On July 1, 2021, the parties filed cross-motions for summary judgment. (Docs. 66, 67.)

On December 17, 2021, after a full briefing (Docs. 68-71), the Court granted Defendant's motion for summary judgment and denied Plaintiff's motion for summary judgment. (Doc. 72.) The same day, judgment was entered. (Doc. 73.)

On January 12, 2022, Defendant timely filed a notice of appeal. (Doc. 77.)

On December 28, 2022, the Ninth Circuit vacated the Court's entry of summary judgment and remanded for further consideration. (Doc. 87.)

On January 5, 2023, the Court informed the parties that it would "reconsider the summary judgment analysis based on the existing briefs and issue a ruling in due course." (Doc. 88.)

On April 14, 2023, the Court issued a tentative ruling. (Doc. 90.)

On April 27, 2023, the Court heard oral argument. (Doc. 92.)

**DISCUSSION**

I.  Legal Standard—Summary Judgment

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018). "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors*, 771 F.3d at 1125 (internal quotation marks omitted).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits,

- 6 -

if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]o carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103. Summary judgment is appropriate against a party that "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

"[W]hen parties submit cross-motions for summary judgment, [e]ach motion must be considered on its own merits," but the Court must consider all evidence submitted in support of both cross-motions when separately reviewing the merits of each motion. *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (quotation marks omitted).

II.     <u>Legal Standard—Undefined Contractual Terms Under Arizona Law</u>

Under Arizona law[2], "[t]he interpretation of an insurance contract is a question of law." *Sparks v. Republic Nat'l Life Ins. Co.*, 647 P.2d 1127, 1132 (Ariz. 1982). "[W]here the provisions of the contract are plain and unambiguous upon their face, they must be applied as written, and the court will not pervert or do violence to the language used, or expand it [beyond] its plain and ordinary meaning or add something to the contract which the parties have not put there." *D.M.A.F.B. Fed. Credit Union v. Emps. Mut. Liab. Ins. Co. of Wis.*, 396 P.2d 20, 23 (Ariz. 1964). "To determine the plain meaning of a term," Arizona courts "refer to established and widely used dictionaries." *W. Corr. Grp., Inc. v. Tierney*, 96 P.3d 1070, 1074 (Ariz. Ct. App. 2004) (citation omitted).

An insurance policy "must be read as a whole, so as to give a reasonable and

---

[2] The parties agree that Arizona law applies here. (Doc. 66 at 7; Doc. 69 at 7.)

1   harmonious effect to all of its provisions." *Charbonneau v. Blue Cross*, 634 P.2d 972, 975
2   (Ariz. Ct. App. 2007). Further, "[i]n the insurer/insured context . . . Arizona's public policy
3   protects insureds. Hence Arizona law requires that undefined terms be given the meaning
4   used by laypeople in everyday usage and that terms and provisions that remain ambiguous
5   after all relevant considerations be interpreted in favor of coverage and against the insurer."
6   *Equity Income Partners, LP v. Chi. Title Ins. Co.*, 387 P.3d 1263, 1268 (Ariz. 2017).

7   "If a policy is subject to 'conflicting reasonable interpretations,' it is ambiguous."
8   *Teufel v. Am. Fam. Mut. Ins. Co.*, 419 P.3d 546, 548 (Ariz. 2018) (citation omitted).
9   However, "[a] contract is not ambiguous just because the parties to it . . . disagree about its
10  meaning. Language in a contract is ambiguous only when it can reasonably be construed
11  to have more than one meaning." *In re Estate of Lamparella*, 109 P.3d 959, 963 (Ariz. Ct.
12  App. 2005). "In determining whether an ambiguity exists in a[n insurance] policy, the
13  language should be examined from the viewpoint of one not trained in law or in the
14  insurance business." *Sparks*, 647 P.2d at 1132. If the policy term is still ambiguous after
15  considering the term's plain and ordinary meaning, Arizona courts consider "legislative
16  goals, social policy, and the transaction as a whole." *First Am. Title Ins. Co. v. Action*
17  *Acquisitions, LLC*, 187 P.3d 1107, 1110 (Ariz. 2008). If these interpretive guides fail to
18  "elucidate a clause's meaning," a court should construe the clause against the insurer. *Id.*

19  "Generally, the insured bears the burden to establish coverage under an insuring
20  clause, and the insurer bears the burden to establish the applicability of any exclusion."
21  *Keggi v. Northbrook Prop. & Cas. Ins. Co.*, 13 P.3d 785, 788 (Ariz. Ct. App. 2000).

22  III.  Discussion

23  The coverage dispute in this case turns on whether Gantz's motorcycle was
24  "designed for use mainly off public roads" and whether the accident occurred "while not
25  on public roads." The parties agree that both conditions must be satisfied to eliminate
26  coverage. That is, if the accident occurred on a public road, the Policy would provide
27  coverage regardless of the motorcycle's design characteristics. Alternatively, if the
28  motorcycle was not designed for use mainly off public roads, the Policy would provide

- 8 -

1 coverage regardless of the location of the accident.

A. **The Ninth Circuit's Decision**

In the earlier summary judgment order, the Court concluded that Gantz's motorcycle was "designed for use mainly off public roads." (Doc. 72 at 13-15.) The Ninth Circuit did not question or disturb this conclusion on appeal and remanded for the purpose of "determin[ing], in the first instance, whether the sand highway is a public road under the insurance policy at issue." *Young*, 17352441 at *1. Accordingly, there is no reason to reconsider, in this order, the earlier analysis concerning how to characterize Gantz's motorcycle. *Hall v. City of Los Angeles*, 697 F.3d 1059, 1067 (9th Cir. 2012) ("The rule of mandate is similar to, but broader than, the law of the case doctrine. A district court that has received the mandate of an appellate court cannot vary or examine that mandate for any purpose other than executing it . . . [and] is limited by our remand when the scope of the remand is clear. Violation of the rule of mandate is a jurisdictional error.") (internal citations and quotation marks omitted).

As for the whether the accident occurred on a "public road," the Court concluded as follows in the December 2021 summary judgment order: "Whether the informal sand highway located in the Imperial Sand Dunes qualifies as a 'public road' is an interesting and close question, but it is unnecessary to resolve that question here in light of Plaintiff's deposition testimony. When asked to identify specifically where he was walking at the time he was struck, Plaintiff admitted that he was next to the fence in a pedestrian area where everybody walk. . . . [T]his testimony is fundamentally inconsistent with the notion that the accident occurred on a public road, because the area next to a road where pedestrians customarily walk is necessarily no longer part of the road. Thus, even assuming the sand highway itself could qualify as a public road, Plaintiff's deposition testimony establishes that he was not on a public road at the time of the accident." (Doc. 72 at 8, cleaned up.)

The Ninth Circuit reversed on this point. It concluded that, as a matter of Arizona law as recognized in *Gittings v. Am. Family Ins. Co.*, 888 P.2d 1363 (Ariz. Ct. App. 1994),

"if, through some mishap, a vehicle veers off the public road on which it was traveling, causing an off-road collision, it may still be said that the accident occurred on a public road. In other words, if an accident began on a public road, it could have occurred on a public road even if the ultimate injury occurred off-road." *Young*, 2022 WL 17352441 at *1 (cleaned up). The court further noted that Defendant bears the burden of proof in this case, because it seeks to avoid liability based on a policy exclusion, and "[w]ithout evidence of how the accident began—including the motorbike's location and path of travel prior to its collision with [Plaintiff]—[Defendant] cannot meet this burden." *Id.* Accordingly, the court vacated the grant of summary judgment and remanded "to the district court to determine, in the first instance, whether the sand highway is a public road under the insurance policy at issue." *Id.*

In the tentative ruling issued before oral argument, the Court interpreted the Ninth Circuit's decision as precluding Defendant, post-remand, from arguing that Gantz was never driving on the sand highway. However, upon reflection and with the benefit of oral argument, the Court agrees with Defendant that this is not the correct interpretation. The better interpretation is that the Ninth Circuit merely observed that *if* Defendant lacks evidence about how the accident began (and thus cannot disprove the possibility that Gantz was driving on the sand highway before veering into the pedestrian area and striking Plaintiff), it is irrelevant whether Plaintiff was walking in the pedestrian area at the moment of impact (because, so long as the sand highway qualifies as a public road, *Gittings* would compel a finding of coverage in that scenario). The Court does not interpret this observation as a conclusive determination that Defendant should be precluded, during a future stage of this case, from attempting to avoid liability by presenting evidence about where Gantz was driving. Nor would such an interpretation of the law of the mandate make sense, given that Gantz's path wasn't a focus of the parties' summary judgment or appellate briefing and Defendant has now identified evidence in the record from which a reasonable factfinder could conclude that Gantz was never driving on the sand highway.[3]

---

[3] More specifically, Defendant explained during oral argument that if Plaintiff was walking in the pedestrian area just before the accident (as Plaintiff testified), was hit in the

With those clarifications in mind, the Court turns to the "public road" analysis.

B.     **The Parties' Arguments**

The parties' arguments have evolved since they filed their original summary judgment briefing, so it is helpful to summarize that evolution here.

The overarching argument raised in Plaintiff's summary judgment briefing is that *Gittings* compels a ruling in his favor. (Doc. 66 at 10-11; Doc. 68 at 6-10; Doc. 70 at 3-5.) According to Plaintiff, *Gittings* holds that, as a matter of Arizona law, a public road is any area that is "intended for vehicular travel." (*Id.*) Plaintiff contends that the sand highway necessarily qualifies as a public road under this definition because it "is on public land," "is used by [off-highway vehicles], trucks and any type of vehicle," and "camping is not permitted in the area where the accident occurred." (Doc. 66 at 12-13.) In a related vein, Plaintiff emphasizes that, after the accident, members of the public and law enforcement used their vehicles to block travel on the sand highway, which suggests the route was "intended for vehicular travel." (Doc. 68 at 8.) Alternatively, Plaintiff argues that even if "public road" is ambiguous, under Arizona law, any ambiguity must be construed in his favor as the insured. (Doc. 66 at 14.)

Defendant's summary judgment briefing offers a different take on *Gittings*. (Docs. 67, 69, 71.) In its affirmative motion for summary judgment, Defendant mentions *Gittings* only in passing and suggests that *Gittings* is distinguishable because it "dealt with whether the area off the highway could be considered part of the 'public roadway' rather than whether a road in general is considered a 'public roadway' to begin with." (Doc. 67 at 14-15.) Similarly, in response to Plaintiff's summary judgment motion, Defendant faults

---

back (as Plaintiff testified), and was eventually found in the middle of the sand highway (as the third-party witnesses testified), common sense and physics suggest that Gantz must have been driving in the pedestrian area (or some other area off the sand highway), only for the force and trajectory of Gantz's motorcycle to cause both Plaintiff and Gantz to tumble into the sand highway post-impact. In response, Plaintiff did not dispute that a reasonable factfinder could accept Defendant's theory of how the accident occurred and simply identified other possible explanations that would involve Gantz beginning (or always remaining) on the sand highway. This exchange underscores why summary judgment would be inappropriate here—there are legitimate disputes of fact about how the accident occurred, and those disputes are material to the question of coverage.

- 11 -

1 Plaintiff for "rel[ying] heavily on *Gittings*" and argues that *Gittings* "has no relation to
2 whether a 'sand highway,' which is simply part of the sand dunes in California, is a 'public
3 road.'" (Doc. 69 at 10-11. *See also id.* at 13 ["Plaintiff . . . relies on *Gittings* to try to
4 establish that the area of the sand dunes where [he] was struck was somehow a 'public
5 road' . . . [but] the Arizona courts have not 'defined' public road in this particular
6 situation."].) Defendant's summary judgment briefing goes on to identify four reasons
7 why the location of the accident should not be considered a public road. First, looking to
8 Arizona's and California's statutory definitions of "highway," Defendant asserts that "it is
9 clear that the area in which this accident occurred was not part of a 'highway' under any
10 definition." (Doc. 67 at 13-14; Doc. 69 at 13-14.) Second, Defendant identifies a pair of
11 unpublished decisions[4] in which courts outside Arizona concluded that somewhat
12 analogous accidents did not occur on a public road. (Doc. 67 at 15; Doc. 69 at 14-15; Doc.
13 71 at 6.) Third, Defendant emphasizes Plaintiff's deposition testimony, which described
14 the location of the accident as the pedestrian area next to the sand highway. (Doc. 67 at
15 15-16; Doc. 69 at 16.) Fourth, Defendant argues that even if Plaintiff was on the sand
16 highway at the time of the accident, it does not qualify as a public road because it is not
17 paved or graded, has no boundaries, markings, or official designations, is not covered by
18 the regulations that the BLM has issued to regulate the "highways" and "roads" in the
19 Dunes, and "is simply an area that has become a 'pathway' for vehicle to use while
20 travelling from the camping area in Glamis Flats out to the dunes." (Doc. 67 at 16-17;
21 Doc. 69 at 15; Doc. 71 at 7.)

22 Given this backdrop, the Court issued a tentative ruling before oral argument that
23 began by addressing *Gittings* but also addressed, in the alternative, how the Court would
24 go about defining the term "public road" if *Gittings* weren't controlling. (Doc. 90.) In this
25 portion of the tentative ruling, the Court "follow[ed] the usual process [under Arizona law]
26 for resolving a dispute about the meaning of an undefined term in an insurance policy. The

---

[4] *Country Mut.l Ins.Co. v. Leffler*, 705 F. App'x 549 (9th Cir. 2017); *Walker v. State Farm Mut. Auto. Ins. Co.*, 259 F. Supp. 3d 1139 (D. Nev. 2017).

first step of that process is to evaluate the term's plain and ordinary meaning (potentially, through the use of dictionary definitions) in an effort to determine whether each side's proffered definition is reasonable." (*Id.* at 16.) This portion of the tentative ruling also discussed the non-*Gittings* cases cited in Defendant's summary judgment papers and the parties' arguments concerning how to resolve ambiguities in insurance contracts. (*Id.* at 16-19.)

During oral argument, Defendant took issue with the inclusion of this alternative analysis in the tentative ruling. Among other things, Defendant characterized *Gittings* as "controlling," argued that "the *Gittings* definition gets us all the way there," and urged the Court "to apply the definition of public roads in *Gittings*." In response, the Court asked Plaintiff if he agreed with Defendant's "argument[] . . . that *Gittings* is controlling here [and] there's no reason for me to try to look to dictionar[ies] to come up with my own definition." Plaintiff replied: "[W]e believe as we submitted in our briefs that *Gittings* is the law and that [Defendant] does not win under this."

In light of these unexpected developments, the Court has eliminated the alternative analysis involving dictionary definitions that appeared in the tentative ruling. Although it might otherwise be debatable whether *Gittings* is controlling here,[5] both sides have now confirmed that they view *Gittings* as controlling and have urged the Court to limit its analysis to *Gittings*. The Court will honor that request. *United States v. Sineneng-Smith*, 140 S.Ct. 1575, 1579 (2020) (discussing "the principle of party presentation," which holds that courts "should not[] sally forth each day looking for wrongs to right" and instead should "wait for cases to come to [them] . . . [and] normally decide only questions presented

---

[5] "When interpreting state law, a federal court is bound by the decision of the highest state court." *In re Kirkland*, 915 F.2d 1236, 1238 (9th Cir. 1990). "If the state's highest court has not decided an issue, it is the responsibility of the federal courts sitting in diversity to predict how the state high court would resolve it." *Albano v. Shea Homes Ltd. P'ship*, 634 F.3d 524, 530 (9th Cir. 2011) (citation and internal quotation marks omitted). "The decisions of the state's intermediate appellate courts are data that a federal court must consider in undertaking this analysis." *Air-Sea Forwarders, Inc. v. Air Asia Co.*, 880 F.2d 176, 186 (9th Cir. 1989). "[W]here there is no convincing evidence that the state supreme court would decide differently, a federal court is obligated to follow the decisions of the state's intermediate appellate courts." *Ryman v. Sears, Roebuck & Co.*, 505 F.3d 933, 995 (9th Cir. 2007) (citation omitted).

by the parties") (citations and internal quotation marks omitted).

C. **Analysis**

1. Definition Of "Public Road" Under *Gittings*

The Policy defines the term "uninsured motor vehicle" as "not includ[ing] any vehicle designed for use mainly off public roads while not on public roads." (Doc. 67-4 at 36-38.) However, the Policy does not further define the term "public roads." Thus, the Court must look to other authorities when deciding how to define that term. As discussed, both sides now agree that the relevant authority here is *Gittings*.

In *Gittings*, the Arizona Court of Appeals was asked to "define the term 'public roads' as it appears in [an insurance] policy's exclusion." 888 P.2d at 1363. There, a collision occurred "within the right-of-way for Mountain Road," which "was a north/south two lane asphalt road" that was otherwise surrounded by "open desert." *Id.* at 1364. Both sides agreed that Mountain Road itself was a public road—the disputed question was whether the unpaved shoulder/right-of-way of Mountain Road also qualified as a public road. Although the court ultimately resolved that question in favor of the insurer, it offered several observations about the nature of "public roads" that, in Plaintiff's view, compel a ruling in his favor here. In a nutshell, Plaintiff argues that *Gittings* stands for the proposition that a public road is any place "intended for vehicular travel." (Doc. 66 at 11-12.) Defendant disagrees, arguing that Plaintiff "has grossly misconstrued the holding of . . . *Gittings*" and that "[i]f anything, . . . *Gittings* 'defined' a public road as those areas on the 'public highway' in which vehicular traffic was intended and specifically found that the off-road vehicles that were not on the highway were not on a 'public road.' As a result, this area in the sand dunes certainly would not qualify." (Doc. 69 at 11, 13.)

In the Court's view, neither side's interpretation of *Gittings* is quite correct. *Gittings* did not hold, as Plaintiff suggests, that any area intended for vehicular travel automatically qualifies as a public road. Nor did *Gittings* hold, as Defendant suggests, that a public road must be, at a minimum, paved and state-sanctioned and part of a highway. Instead, *Gittings* identified several factors that bear on whether a particular area qualifies as a public road:

(1) whether the area is "ordinarily used for vehicular traffic" and whether there are any contraindications of vehicular use, as emphasized in *Lally v. Automobile Mut. Ins. Co.*, 337 A.2d 243 245 (R.I. 1975); (2) whether the area has identifiable boundaries, as emphasized in *Bloomquist v. NWNL Gen. Ins. Co.*, 421 N.W.2d 416 (Minn. Ct. App. 1988); (3) whether the area, "although not officially opened to the public, had been frequently traversed by several local vehicles," as emphasized in *Leski v. State Farm Mut. Auto. Ins. Co.*, 116 N.W.2d 718 (Mich. 1962); (4) whether the area is "set aside for parking or [is] paved for purposes not intended for vehicular travel" or is "reserved exclusively for emergency parking," as emphasized in *Salinas v. Kahn*, 407 P.2d 120 (Ariz. Ct. App. 1965); and (5) "the reality of the situation, rather than the legal description of" the area. 888 F.2d at 1366-38. *Gittings* also rejected reliance on "statutory definitions, especially those dealing with the Department of Transportation and the highway system, as opposed to automobile insurance" for purposes of defining the term "public roads" in an insurance policy. *Id.*[6] Finally, *Gittings* more broadly provided that the "most reasonable definition [of public roads] . . . depends on the circumstances of the accident." *Id.* at 1365.[7]

Ultimately, *Gittings* held "public roads" to mean "those areas which a reasonable person using the highway, having cognizance of all pertinent road signs and markings, would consider to be intended for vehicular travel, including the berm or shoulder of the highway if the same is improved for vehicular traffic." *Id.* at 1368 (citation omitted). At first blush, this formulation might appear to favor Defendant, because it suggests that "pertinent road signs and markings" and "improve[ments]" and close vicinity to the "highway"—features that are absent here—are a necessary component of any public road.

---

[6] Thus, Defendant's reliance on the statutory definition of "highway" under California and Arizona law (Doc. 67 at 13-14; Doc. 69 at 13-14) is misplaced, as is Plaintiff's reliance on the statutory definition of "forest roads" under Arizona law (Doc. 66 at 11).

[7] In the tentative ruling issued before oral argument, the Court noted that this passage from *Gittings* seems to conflate the first part of the coverage inquiry (ascertaining the meaning of the policy language, which presents a question of law) and the second part of the inquiry (applying the policy language, as defined during the first step, to the facts of the case to determine whether coverage exists). During oral argument, neither side offered an alternative explanation.

But *Gittings* also explained that this definition was applicable "to the exclusion in *this* case." *Id.* at 1369 (emphasis added).

Acknowledging that *Gittings* is not a model of clarity on the point, the Court does not construe *Gittings* as establishing, as a matter of Arizona law, that any public road must have road signs, markings, and improvements and be adjacent to the highway. Instead, the *Gittings* court simply mentioned those features when analyzing the application of the exclusion "in this case," because those features were relevant given "the circumstances of the accident." *Id.* at 1365, 1369. The heart of *Gittings*'s "public roads" analysis was its broader discussion of *Lally*, *Bloomquist*, *Leski*, and *Salinas*, and from that discussion it is possible to distill a more durable definition of "public road" that is not so case-specific—namely, that a public road is defined as an unobstructed area, with boundaries, that is not set aside for a purpose inconsistent with vehicular travel and is ordinarily and actually used for vehicular travel in practice. This definition, it should be noted, would not change the outcome in *Gittings*, as it was the presence of the utility pole on the shoulder of Mountain Road (*i.e.*, an obstruction) and the vehicle's line of travel in the opposite direction of the legal flow of travel on the paved roadway (*i.e.*, absence of ordinary and actual use for vehicular travel in practice) that resulted in the denial of coverage. *Gittings*, 888 P.2d at 1369 ("Under the stipulated facts of this case, no reasonable person using the highway, being cognizant of the conditions surrounding this accident, would conclude that the unpaved shoulder of Mountain Road, where a utility pole was located, was intended for vehicular travel in the opposite direction from the flow of the road traffic.").

2. <u>Factual Disputes Preclude The Entry Of Summary Judgment</u>

Although Plaintiff has largely prevailed regarding how to define the term "public road," it doesn't follow that Plaintiff is entitled to summary judgment. As noted, the definition derived from *Gittings* is that a public road is an unobstructed area, with boundaries, that is not set aside for a purpose inconsistent with vehicular travel and is ordinarily and actually used for vehicular travel in practice.

The evidence regarding some of these features is undisputed. For example, it is

undisputed that the portion of the sand highway at issue here is on land owned by the government, is visually and physically unobstructed, and does not require special permission or payment to access. (*See, e.g.*, Doc. 66-2 at 42 ["The collision occurred on public land."]; *id.* at 10 ["This is considered one of what we call 'Sand Highway.' The most frequent driven sand highway in the area."].) As for whether the area is ordinarily and actually used for vehicular travel in practice, Defendant concedes that the sand highway "has become a 'pathway' for vehicles to use while travelling from the camping area at Glamis Flats out to the dunes." (Doc. 67 at 16.)[8]

However, the evidence concerning other features is legitimately disputed. For example, although there is some evidence (such as the photograph with Plaintiff's handwriting on it, which notes the location of the fence line) from which a reasonable factfinder could conclude that the sand highway has boundaries, there is other evidence that could lead a reasonable factfinder to conclude the sand highway lacks boundaries. (Doc. 67-9 at 19 [Sergeant Masad, agreeing that "other than seeing the tracks where people have driven, there's no railing, there's no sort of marker, there's no plants, there's nothing that tells me this is the sand highway"].)

Finally, even if Plaintiff succeeds in showing, as a factual matter, that the sand highway qualifies as a public road under the *Gittings* definition, Defendant may avoid coverage by establishing, as a factual matter, that Gantz was never driving on the sand highway and that the accident occurred while Plaintiff was also not on the sand highway. As discussed elsewhere in this order, the evidence regarding Gantz's path is disputed. This provides another reason why summary judgment must be denied.

…

…

---

[8] Eyewitness accounts following the accident bear out the reality of the sand highway functioning, in practice, as an area used for vehicular travel. (Doc. 66-2 at 8 ["A number of us ran out to find [Plaintiff] laying about 10-15 feet apart in the middle of sand highway and then noticed a motorcycle 25-30 feet west of the accident."]; *id.* at 10 ["Michael Schafer had already pulled his Ford Explorer to block any traffic from hitting them."]; *id.* at 13 ["There were several people at the scene trying to direct traffic away from [Plaintiff]."].)

Accordingly,

**IT IS ORDERED** that Plaintiff's motion for summary judgment (Doc. 66) and Defendant's motion for summary judgment (Doc. 67) are both **denied**.

**IT IS FURTHER ORDERED** that counsel shall confer (among themselves and with their respective clients and witnesses) and, within 14 days of the issuance of this order, file a joint notice indicating an estimated length of trial. In the joint notice, the parties shall also propose at least three dates on which they and their witnesses will be available to begin trial. The ranges in which the Court is currently available for trial are in September 2023 or from January 2024 onward.

Dated this 4th day of May, 2023.

Dominic W. Lanza
United States District Judge